**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

----------------------------------------------------------- x

ANAT GORDON,                                                 :
on behalf of Plaintiff and a class,                          :
                                                             :
                         Plaintiff,                          :
                                                             :
            vs.                                              :        2:20-cv-03792-JS-AYS
                                                             :
UNITED STATES FIRE INSURANCE                                 :
COMPANY,                                                     :
                                                             :
                         Defendant.                          :

----------------------------------------------------------- x


### PLAINTIFF'S RESPONSE TO MOTION TO DISMISS AMENDED COMPLAINT

Daniel A. Edelman
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com


Adam J. Fishbein
735 Central Avenue
Woodmere, NY 11598
(516) 668-6945
fishbeinadamj@gmail.com

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

I.    STATEMENT OF FACTS .................................................................................... 1

II.   APPLICABLE STANDARD OF CONSTRUCTION ........................................... 4

III.  PLAINTIFF SATISFIES ARTICLE III .............................................................. 4

IV.   PLAINTIFF ALLEGES THAT THE AMOUNT PAID WAS NON-REFUNDABLE ................. 8

V.    PLAINTIFF IS NOT REQUIRED TO ALLEGE ABSENCE OF OTHER INSURANCE ........ 10

VI.   PLAINTIFF'S MINOR SON WAS "QUARANTINED" .................................... 10

VII.  THE FACT THAT COVID ORDERS PROHIBITED THE OPERATION OF CAMP
      LENOX AS WELL AS PROHIBITED A BUSLOAD OF CAMPERS FROM   ASSEMBLING
      AND TRAVELING THERE IS NOT A DEFENSE................................................ 15

VIII. U.S. FIRE MISSTATES RELEVANT COVID ORDERS PROHIBITING THE
      OPERATION  OF CAMP LENOX............................................................... 18

XI.   CONCLUSION.................................................................................... 20

# TABLE OF AUTHORITIES

*1070 Park Ave. Corp. v. Fireman's Fund Ins. Co.*
   313 F. Supp. 3d 528 (S.D.N.Y. 2018) .............................................................................................. 15

*Albert J. Schiff Associates, Inc. v. Flack,*
   51 N.Y.2d 692, 417 N.E.2d 84, 435 N.Y.S.2d 972 (1980) ............................................................ 18

*Amato v. Elicker,*
   460 F. Supp. 3d 202 (D. Conn. 2020) ............................................................................................. 13

*Antietam Battlefield KOA v. Hogan,*
   461 F. Supp. 3d 214 (D ....................................................................................................................13

*Barash v. Insurance Co. of North America,*
   114 Misc. 2d 325, 451 N.Y.S.2d 603 (Sup.Ct. Nassau Co. 1982) ............................................. 9, 16

*Benjamin Enterprises, Inc.,*
   679 F.3d 41 (2d Cir. 2012) .............................................................................................................. 20

*Berger v. L.L. Bean, Inc.,*
   351 F. Supp. 3d 256 (E.D.N.Y. 2018) .......................................................................................... 5, 6, 8

*Broidy Capital Mgmt. LLC v. Benomar*
   944 F.3d 436 (2d Cir.  2019) ............................................................................................................. 5

*Cassell v. Snyders,*
   458 F. Supp. 3d 981 (N.D.Ill. 2020) ............................................................................................... 12

*County of Butler v. Wolf,*  2:20cv677,
   2020 U.S. Dist. LEXIS 167544 (W.D. Pa. Sept. 14, 2020) ................................................... 11,12,13

*Cragg v. Allstate Indem. Corp.,*
   17 N.Y.3d 118, 950 N.E.2d 500, 926 N.Y.S.2d 867 (2011) ......................................................... 4, 10

*Craig v. Boren,*
   429 U.S. 190  (1976) ........................................................................................................................ 5

*D'Antonio v. Metro. Transp. Auth.,* 06cv4283,
   2008 U.S. Dist. LEXIS 16726 (S.D.N.Y. March 4, 2008) .............................................................. 5

*Davis v. United States:*15cv159,
   2016 U.S. Dist. LEXIS 177541 (S.D.Tex., Sept. 8, 2016),
   adopted 2016 U.S. Dist. LEXIS 177069, 2016 WL 7392229 (S.D.Tex. Dec. 21, 2016)............................. 11

*Defender Sec. Co. v. First Mercury Ins. Co.,*
   803 F.3d 327 (7th Cir. 2015) .......................................................................................................... 5

*DiCarlo v. St. Mary Hosp.,*
   530 F.3d 255 (3d Cir. 2008) ........................................................................................................... 5

*Doe v. Quest Diagnostics, Inc.,* 15cv8992,
   2017 U.S. Dist. LEXIS 42885, 2017 WL 1102663 (S.D.N.Y. Mar. 23, 2017) ............................. 6,7

*Early v. Bankers Life & Cas. Co.,*

959 F.2d 75 (7th Cir. 1992) ............................................................................................ 5

*Firestine v. Poverman,*
    388 F. Supp. 948 (D.Conn. 1975) ............................................................................ 10

*Financial Conduct Authority v Arch Insurance (UK) Ltd and Others*
    [2021] UKSC 1 (Jan. 15, 2021). ....................................................................... 16,17

*First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba,*
    462 U.S. 611 (1983) ................................................................................................. 16

*Habitat Educ. Ctr. v. U.S. Forest Serv.,*
    607 F.3d 453 (7th Cir. 2010) ..................................................................................... 7

*Illinois C. R. Co. v. McKendree,*
    203 U.S. 514 (1906) ................................................................................................. 11

*In re O.W. Bunker Holding N. Am. Inc.,*
    607 B.R. 47 (Bankr. D. Conn. 2019) ....................................................................... 16

*In re Waikoloa Sanitary Sewer Co. Inc.,*
    125 P.3d 484 (Haw. 2006) .......................................................................................... 8

*Ingraham v. United States,*
    808 F.2d 1075 (5th Cir. 1987) ................................................................................ 10

*Johnson v. City of Shelby, Mississippi,*
    574 U.S. 10 (2014) ................................................................................................... 19

*McGhee v. City of Flagstaff,* 20cv08081,
    2020 WL 2308479 ................................................................................................... 13

*Mostow v. State Farm Ins. Cos.,*
    88 N.Y.2d 321, 668 N.E.2d 392, 645 N.Y.S.2d 421 (1996) ............................... 4, 10

*MSPA Claims 1, LLC v. Tenet Fla., Inc.,*
    918 F.3d 1312 (11th Cir. 2019) ................................................................................. 7

*Murphy v. Lamont,* 3:20cv0694
    2020 U.S. Dist. LEXIS 136961 (D. Conn. Aug. 3, 2020) ....................................... 13

*Pegram v. Herdrich,*
    530 U.S. 211 (2000) ................................................................................................... 5

*Port Auth. of N.Y. & N.J. v Everest Natl. Ins. Co.,* 653659/13,
    2018 N.Y. Misc. LEXIS 3225 (U) (Sup.Ct.) ......................................................... 10

*Rex v. Chase Home Fin. LLC,*
    905 F.Supp.2d 1111 (C.D.Cal. 2012) ........................................................................ 5

*Smith v. State,*
    74 Tex. Crim. 232, 168 S.W. 522 (1914) ............................................................... 11

*Svensson v. Securian Life Ins. Co.*
    706 F. Supp. 2d 521 (S.D.N.Y. 2010) ..................................................................... 15

*Van v. LLR, Inc.,*
   962 F.3d 1160 (9th Cir. 2020) ............................................................................ 7

*Valkering, U.S.A. v. United States Dep't of Agriculture,*
   48 F.3d 305 (8th Cir. 1995) ............................................................................... 11

*W. Tex. Agriplex v. Mid-Continent Cas. Co.,* 03cv199,
   2004 U.S. Dist. LEXIS 12489 (N.D.Tex., July 7, 2004) ................................. 10

*Wells Fargo Bank, N.A. v. BrooksAmerica Mortg. Corp.,*
   419 F.3d 107 (2d Cir. 2005) ............................................................................... 8

**Rules and Statues**

A.R.S. §§36-788, 36-789 ......................................................................................... 14

Connecticut General Statutes, Sections 19a-131(6) and (9) ................................. 13

Executive Order 2020-33 ......................................................................................... 14

Executive Order 202.1 .............................................................................................. 3

Executive Order 202.3 .............................................................................................. 3

Executive Order 202.42 ........................................................................................... 19

Fed. R. Civ.P. 12(b)(1) ............................................................................................. 5

N.Y. Comp. Codes R. & Regs. tit. 10, § 2.2 ......................................................... 12

New York Insurance Law, §2601 ............................................................................. 7

Pennsylvania Disease Prevention and Control Law of 1955, 35 P.S. 521.2 ......... 11

## I.  STATEMENT OF FACTS

Plaintiff Anat Gordon is a resident of Roslyn New York. (AC, ¶5)  She  is the parent of minor son M Gordon.   (AC, ¶8)

Defendant United States Fire Insurance Company ("U.S. Fire") underwrites travel and trip and event cancellation insurance.  (AC, ¶7)

Plaintiff contracted to send her son M to overnight summer camp at Camp Lenox in Otis, Massachusetts, during the period June 27, 2020 to August 15, 2020, at a cost of $11,800, which she prepaid.   (AC, ¶9)  The camp is generally attended by several hundred children.  (AC, ¶10)

The camp promotes itself (https://www.camplenox.com/program-activities) as offering premier sports programs led by top-notch coaches, including golf, tennis, horseback riding, whitewater rafting, ice hockey, football, soccer, and volleyball.  There are also group games and events.  (AC, ¶11)  Camp activities required close physical contact. (AC, ¶12)  The camp required campers to live in cabins and eat in a communal dining area, requiring close physical proximity among them.  (AC, ¶13)

The camp arranged (through its website) for transport of campers to and from the camp via charter bus.  There were one or more pickup points on Long Island.  (AC, ¶14)

Plaintiff registered her son for camp on line, arranged for transport via the charter bus, also on line, and paid in advance.  (AC, ¶15)  On information and belief, Plaintiff had no contractual right to a refund. Parents are expected to pay in advance. No right to any refund is mentioned on the Camp Lenox website. Instead, it advises the purchase of travel insurance.  (AC, ¶16)

To protect against loss, Plaintiff purchased an "A+ Program Protection Plan"  with an effective date of July 26, 2019.  (AC, ¶17)   The "A+ Program Protection Plan" is a policy of travel, trip or event insurance underwritten by Defendant U.S. Fire.  (AC, ¶18)  A copy of the policy is in AC, Appendix A. A copy of the Purchase Confirmation is in AC, Appendix B.  (AC, ¶19)  Plaintiff

paid the premium required for the coverage and the policy was in full force and effect at the time of the events described below.   (AC, ¶20)

Appendix A stated that "Benefits will be paid, up to the Maximum Benefit Amount shown in the Confirmation of Benefits, to cover You for the unused non-refundable  prepaid expenses for Program Arrangements when You are prevented from taking Your Trip due to . . . the Other Covered Reasons listed below; provided such circumstances occurred after Your Effective Date." (AC, ¶22)   The "Other Covered Reasons" included "You or Your Traveling Companion being . . . quarantined . . ."  (AC, ¶23)

"Quarantined" is not defined in the policy.  (AC, ¶24)   The common meanings of "quarantine" include (a) "a restraint upon the activities or communication of persons or the transport of goods designed to prevent the spread of disease or pests" (https://www.merriam-webster.com/dictionary/quarantine), as well as (b)  "a state of enforced isolation."  (*Id.*)  (AC, ¶25)

On January 30, 2020, the World Health Organization declared COVID-19 a "Global Health Emergency;" a "Public Health Emergency of International Concern." (AC, ¶26) On January 31, 2020, the President declared COVID-19 a public health emergency. (AC, ¶27) On February 21, 2020, the CDC warned that U.S. health officials were preparing for the coronavirus to become a pandemic. (AC, ¶28) On February 29, 2020, the U.S. government issued a "do not travel" warning and prohibited travel between the United States and several countries with COVID-19 outbreaks. (AC, ¶29)

On March 23, 2020, the Commonwealth of Massachusetts issued COVID-19 Order No. 13, which closed all businesses other than those providing essential services, prohibited indoor gatherings of more than 10 people, and prohibited all recreational and athletic activities, regardless of size, that brought persons into close physical contact.   (AC, ¶32) A summer camp is not

"essential."  (AC, ¶33)  Furthermore, Camp Lenox' program involved indoor gatherings of more than 10 people and recreational and athletic activities that brought persons into close physical contact.  (AC, ¶34)

Subsequent orders extended the prohibition until May 4, 2020 (AC, ¶35), and May 18, 2020 (AC, ¶36) On May 8, 2020 and June 6, 2020, Massachusetts issued orders providing for the phased reopening of certain businesses, but not permitting a summer camp starting June 27, 2020.  (AC, ¶37)

On March 7, 2020, the State of New York declared itself to be a disaster area as a result of the COVID-19 pandemic.  (AC, ¶39) On March 12, 2020, by Executive Order 202.1, the State of New York ordered that "Any place of business or public accommodation, and any gathering or event for which attendance is anticipated to be fewer than five hundred people, shall operate at no greater than fifty percent occupancy, and no greater than fifty percent of seating capacity, for thirty days effective on Friday, March 13, 2020 . . . ."  (AC, ¶40)  On March 16, 2020, by Executive Order 202.3, the State of New York ordered that "any large gathering or event (concert, conference, worship service, performance before a large audience, etc.) shall be cancelled or postponed if more than fifty persons are expected in attendance, at any location in New York State until further notice." (AC, ¶41) These restrictions were extended to April 15, 2020 (AC, ¶45), May 15, 2020 (AC, ¶46), May 28, 2020 (AC, ¶47).  Finally, they were extended indefinitely and expanded to "all non-essential gatherings of more than ten individuals," with provision for gradual reopening by business and region.  (AC, ¶48)

The Massachusetts orders required the operator of Camp Lenox to cancel  the summer camp to be attended by M Gordon.  (AC, ¶50)   The New York orders made it unlawful to assemble and pick up a busload of campers in New York and transport them to Massachusetts.    (AC, ¶51)

Plaintiff was orally notified of the cancellation, followed by the document in AC, Appendix

-3-

C.  (AC, ¶52)   Of the total amount she paid the camp, Plaintiff was voluntarily reimbursed $6,000 and $2,000 (total $8,000) by the camp operator.   (AC, ¶53; Declaration  of Anat Gordon [Exhibit A])

On information and belief, Plaintiff did not have a contractual right to a refund.  (AC, ¶54) A right to a refund was not a stated term of the contract formed by Plaintiff and the camp operator on the operator's website.  (AC, ¶55)

The cancellation of events by official order issued for the purpose of curbing the spread of contagious disease at such events, and the prohibition of the designated mode of transportation to the event to prevent the spread of contagious disease among the persons being transported, effected a "quarantine" applicable to Plaintiff's son and others who would attend such events.  (AC, ¶57)

Plaintiff made a claim under the policy.  (AC, ¶58) U.S. Fire denied the claim. On July 31, 2020, Plaintiff received a message stating that the claim was determined not payable.  (AC, ¶59 and Appendix D)  No formal reason for denial was provided. (AC, ¶60)

## II.   APPLICABLE STANDARD OF CONSTRUCTION

Under New York law "[i]nsurance contracts must be interpreted according to common speech and consistent with the reasonable expectations of the average insured," *Cragg v. Allstate Indem. Corp.*, 17 N.Y.3d 118, 122, 950 N.E.2d 500, 502, 926 N.Y.S.2d 867, 869 (2011), and any ambiguities must be construed in favor of the insured. *Id.*  New York law focuses on "the reasonable expectations of the average insured upon reading the policy . . . and employing common speech . . . ."  *Mostow v. State Farm Ins. Cos.*, 88 N.Y.2d 321, 326-327, 668 N.E.2d 392, 394, 645 N.Y.S.2d 421, 423 (1996).

## III.   PLAINTIFF SATISFIES ARTICLE III

U.S. Fire's Article III argument has no merit.  Its argument (Def.Mem., p. 3) is that Plaintiff "has failed to allege a definitive injury and has not satisfied her burden of pleading standing"

-4-

because she "fails to specify whether she has demanded a full refund from Camp Lenox, whether it was denied, and whether Plaintiff has received credit for camp next summer."

Plaintiff submits a declaration (Exhibit A)[1] stating that she did request a full refund, that eventually she got back $8,000 ($2,000 after U.S. Fire filed its motion) , and that she is out $3,800, which she has not received.  The camp has offered credits, of no value to Plaintiff because she does not intend to deal with the camp in the future.

Economic injury is the epitome of "concrete" harm that satisfies Article III.  *Craig v. Boren*, 429 U.S. 190, 194-95  (1976).  Therefore, "an Article III injury exists where there is a dispute between parties as to the amount one owes under a contract . . . ."  *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 263 (3d Cir. 2008); *Rex v. Chase Home Fin. LLC*, 905 F.Supp.2d 1111, 1145 (C.D.Cal. 2012).

U.S. Fire  issued an insurance policy.  Plaintiff claims she is entitled to be paid money under that policy, as are others similarly situated.  U.S. Fire denies Plaintiff is entitled to payment.  This sort of dispute is adjudicated by federal courts every day.  Regardless of the ultimate outcome, it presents a "case or controversy."

U.S. Fire relies on *Berger v. L.L. Bean, Inc.,* 351 F. Supp. 3d 256, 259 (E.D.N.Y. 2018), which is completely inapposite.  Prior to February 2018, L.L. Bean offered a "100% Satisfaction

---

[1]  Evidence outside the pleadings by affidavit is proper on a motion to dismiss under Rule 12(b)(1).  *Broidy Capital Mgmt. LLC v. Benomar,* 944 F.3d 436, 441 (2d Cir.  2019).  On a 12(b)(6) motion, while defendant is generally confined to the allegations of the complaint, the plaintiff is entitled to set forth what evidence consistent with the allegations of the complaint would sustain a claim.  *Early v. Bankers Life & Cas. Co.*, 959 F.2d 75, 79 (7th Cir. 1992) ("[A] plaintiff is free, in defending against a motion to dismiss, to allege without evidentiary support any facts he pleases that are consistent with the complaint, in order to show that there is a state of facts within the scope of the complaint that if proved ... would entitle him to judgment."); *Pegram v. Herdrich*, 530 U.S. 211, 230 n. 10 (2000); *Defender Sec. Co. v. First Mercury Ins. Co.*, 803 F.3d 327 (7th Cir. 2015); *D'Antonio v. Metro. Transp. Auth.,* 06cv4283, 2008 U.S. Dist. LEXIS 16726, *5, 2008 WL 582354 (S.D.N.Y. March 4, 2008) (plaintiff entitled to clarify facts).

Guarantee" on everything it sold, stating that "if something's not working or fitting or standing up to its task or lasting as long as you think it should, [the company would] take it back," without limitation. In February 2018, L.L. Bean announced that customers who purchase L.L. Bean products on or after February 9, 2018 and who "are not 100% satisfied . . . may return [the products] within one year of purchase for a refund. After one year, [L.L. Bean] will consider any items for return that are defective due to materials or craftsmanship." The February 2018 policy was not retroactive, except that L.L. Bean said it would require proof of purchase and not take back products "damaged by misuse, abuse, improper care or negligence, or accidents (including pet damage)" or "excessive wear and tear." (351 F.Supp.3d at 259-60)

Plaintiff had purchased a jacket from L.L. Bean prior to February 9, 2018. On February 28, 2018, without attempting to return the item and without stating any intention to do so, plaintiff filed suit complaining of the policy change. The court found a case or controversy lacking because there was no indication plaintiff would suffer any harm from the policy:

> [I]t is evident that Berger has not suffered a concrete injury-in-fact. . . . Berger's only arguable injury is that, if, in the future, she attempts to return her jacket, she will, first, have to produce proof of purchase, and, second, worry that the return will not be accepted because L.L. Bean determines that the jacket was damaged due to misuse or excessive wear and tear. But these concerns are, at best, distant since Berger has not attempted to return an L.L. Bean product and been refused a refund. She has not even alleged that she is dissatisfied with her jacket or intends to return it in the future. Nor has she claimed to lack proof of purchase. For this reason, to the extent plaintiff's injury is her purported future inability to return her jacket, she has not satisfied the requirements of Article III standing. (351 F. Supp. 3d at 261)

U.S. Fire also cites *Doe v. Quest Diagnostics, Inc.*, 15cv8992, 2017 U.S. Dist. LEXIS 42885, 2017 WL 1102663, at *4 (S.D.N.Y. Mar. 23, 2017), where a patient complained that defendant had inadvertently faxed her test results to the wrong party. The information had not been misused or gotten into the hands of anyone interested in misusing it. The recipient had alerted the sender that it received the erroneous transmission. The court held that the plaintiff had failed to allege either actual harm or a risk of harm, distinguishing cases where hackers had obtained private information,

-6-

because there is a likelihood they will misuse it. (2017 U.S. Dist. LEXIS 42885, *11-12)

Here, in contrast, Plaintiff paid money for her son to attend camp. Her son was prevented from attending, and Plaintiff is still out $3,800. In common understanding, if a consumer pays $3,800 for something that she does not receive, she has been injured.

Moreover, even if a full refund is eventually obtained, the consumer is deprived of the time value of the money, which is sufficient to satisfy Article III. *Van v. LLR, Inc.*, 962 F.3d 1160, 1161 (9th Cir. 2020); *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019) ("[t]he inability to have and use money to which a party is entitled is a concrete injury."). "Every day that a sum of money is wrongfully withheld, its rightful owner loses the time value of the money." *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 457 (7th Cir. 2010). Recognizing this, all states require insurance companies to pay or deny claims within short periods. E.g., New York Insurance Law, §2601 (30 business days).

For this reason, U.S. Fire's speculation that maybe Camp Lenox will at some future time pay the remaining $3,800, voluntarily or otherwise, does not defeat standing. Consider the common case of a car owner whose insured vehicle is damaged by a negligent driver. She has a claim under her policy and a claim against the other driver. The fact that the other driver (or his insurer) may eventually pay does not mean that her own insurer can refuse to promptly pay for repairs or that if it does refuse and she sues, there is no "case or controversy." Her insurer's obligation is to promptly pay under its policy, upon which it is subrogated to the insured's rights.

U.S. Fire's claim that it is possible Plaintiff "will receive a double recovery" (Def.Mem., p. 10 n. 4) ignores the law of subrogation. If U.S. Fire pays its insured, it is subrogated to whatever rights its insured has against the party whose conduct required the payment.

## IV.   PLAINTIFF ALLEGES THAT THE AMOUNT PAID WAS NON-REFUNDABLE

U.S. Fire raises an issue concerning the meaning of "non-refundable" in the policy.  It asserts that "Plaintiff fails to plead that the contract with Camp Lenox prohibited refunds if the summer program was cancelled . . . ."  (Def.Mem., p. 13)

The common meaning of "non-refundable" is simply "not subject to refunding or being refunded."  (https://www.merriam-webster.com/dictionary/nonrefundable) Plaintiff  alleges that there was no right to a refund in the contract Plaintiff made via website. (AC, ¶15-16)

"Non-refundable" can encompass a variety of factual situations:

1.      At one extreme, a contract can contain an express provision that a party's financial obligation is "absolute and unconditional," without regard to defective performance or complete non-performance by the other party, natural disasters, or anything else.  *Wells Fargo Bank, N.A. v. BrooksAmerica Mortg. Corp.*, 419 F.3d 107, 110 (2d Cir. 2005).  Even such "hell or high water" clauses are not literally absolute  – they do not apply to fraud by the party imposing the clause.  *Id. In re Waikoloa Sanitary Sewer Co. Inc.*, 125 P.3d 484, 495 (Haw. 2006), cited by U.S. Fire (Def.Mem., p. 12), is of this nature; it involved a filed tariff expressly providing that certain payments were "non-refundable."  Such provisions are unusual in consumer contracts.

2.      At the other extreme, some businesses by contract or policy will allow goods to be returned and transactions to be undone at the option of the consumer.  *Berger v. L.L. Bean, Inc., supra,* 351 F. Supp. 3d 256 (E.D.N.Y. 2018).

3.      Between the extremes, there are many contracts where there is a completed contract, often with payment in full made by the purchaser, and no express right to cancel.  Plaintiff's transaction is of this nature.  So are most purchases of vehicles.

This does not mean that in the event of nonperformance or seriously defective performance, the purchaser has no legal claim to get her money back.  Under the Uniform Commercial Code and

consumer protection laws, the purchaser of a used car that cannot be safely driven may have a legal claim for revocation of acceptance or rescission.  However, enforcing that right generally requires legal action.  A reasonable consumer would consider the purchase of an automobile as "non-refundable," notwithstanding the possibility of a claim if the car is defective or the dealer commits fraud.

In the context of travel or event insurance, an insured would reasonably expect that if she pays in advance for an event, is not given any express right to cancel and obtain a refund, and is told by the event provider to secure travel insurance to protect herself against loss, the travel insurer would protect her against paying money for nothing.  If the trip or event is cancelled, and the consumer cannot actually obtain a prompt and full refund, the insurer must pay.  If there is legal recourse against the business that was to conduct the trip or event, it becomes the responsibility of the insurer to pursue the business under its subrogation rights.

U.S. Fire asserts (Def.Mem., p. 14) that only an express "hell or high water" clause is covered.  Since such clauses are rarely found in consumer contracts, U.S. Fire's policy covered essentially nothing.  This is not reasonable.  Under New York law, "The question is whether the insured at the time of obtaining the insurance could reasonably expect that damage such as occurred here would be covered by the policy as written."  *Barash v. Insurance Co. of North America,* 114 Misc. 2d 325, 329, 451 N.Y.S.2d 603, 606 (Sup.Ct. Nassau Co. 1982).

Thus, the fact that a partial refund was made does not make the policy inapplicable.  One of the insured events is "Bankruptcy or Default of an airline, cruise line, tour operator or Program Supplier (other than the tour operator or travel agency from whom You purchased Your Program Arrangements)." (Policy, p. 5) Bankruptcy proceedings sometimes produce a dividend for creditors. Default by the "Program Supplier" may entitle the consumer to legal redress against it.  However, the entire purpose of travel insurance is to provide prompt and expeditious recourse to the

consumer.  A reasonable interpretation of a trip or event insurance policy does not require the consumer to file suit against the "Program Supplier" or await the outcome of insolvency proceedings. That is not within the accepted meaning of "refundable."

## V.    PLAINTIFF IS NOT REQUIRED TO ALLEGE ABSENCE OF OTHER INSURANCE

Although not raised by any premotion letter and readily curable, U.S. Fire now claims that the Amended Complaint is defective because Plaintiff has not negated all exclusions under the policy, particularly one providing that "The insurance provided by this Policy … shall be in excess of all other valid and collectible insurance or indemnity. . . ."

There is in fact no other insurance.  (Exhibit A) The Amended Complaint alleges that Plaintiff purchased the one policy of insurance (AC, ¶17) Allowing U.S. Fire to raise this argument without mentioning in its premotion letters would sanction "sandbagging."

In any event, a policy exclusion is in the nature of an affirmative defense and the insurer has the burden of alleging and ultimately proving its application.  *Firestine v. Poverman*, 388 F. Supp. 948, 951 (D.Conn. 1975); *W. Tex. Agriplex v. Mid-Continent Cas. Co.*, 5:03cv199, 2004 U.S. Dist. LEXIS 12489, *24 (N.D.Tex., July 7, 2004).  State practice, which governs in a diversity case, *Ingraham v. United States*, 808 F.2d 1075, 1078 (5th Cir. 1987), is that "other insurance" is an affirmative defense. *Port Auth. of N.Y. & N.J. v Everest Natl. Ins. Co.*, 653659/13, 2018 N.Y. Misc. LEXIS 3225, *3, 2018 NY Slip Op 31795(U) (Sup.Ct.).

## VI.    PLAINTIFF'S MINOR SON WAS "QUARANTINED"

Defendant insists that "quarantined" can only be satisfied by an order requiring that Plaintiff's son be "isolated" or "confined."  (Def.Mem., p. 3-4)

However, the common meaning of "quarantine" is what controls.  *Cragg v. Allstate Indem. Corp., supra,* 17 N.Y.3d 118, 122, 950 N.E.2d 500, 502, 926 N.Y.S.2d 867, 869 (2011); *Mostow v. State Farm Ins. Cos., supra,* 88 N.Y.2d 321, 326-327, 668 N.E.2d 392, 394, 645 N.Y.S.2d 421, 423 (1996).

That common meaning includes (a) "a restraint upon the activities or communication of persons or the transport of goods designed to prevent the spread of disease or pests" (https://www.merriam-webster.com/dictionary/quarantine) as well as (b) "a state of enforced isolation."

For example, for over a century there have been "quarantine lines" and "quarantine zones" applicable in many areas of the United States, requiring inspection, disinfection or treatment of animals and plants before they are moved across the lines. *Valkering, U.S.A. v. United States Dep't of Agriculture*, 48 F.3d 305 (8th Cir. 1995); *Illinois C. R. Co. v. McKendree*, 203 U.S. 514 (1906); *Smith v. State*, 74 Tex. Crim. 232, 168 S.W. 522 (1914); *Davis v. United States*, 1:15cv159, 2016 U.S. Dist. LEXIS 177541 (S.D.Tex., Sept. 8, 2016), adopted, 2016 U.S. Dist. LEXIS 177069, 2016 WL 7392229 (S.D.Tex. Dec. 21, 2016).  The movement of the animals and plants is restricted by governmental order, but they are not strictly confined or isolated as Defendant contends is required.

Defendant cites a series of inapposite, non-insurance cases which construe statutes and regulations that define what actions constitute a quarantine within those statutes  and regulations:

1.     *County of Butler v. Wolf*,  2:20cv677, 2020 U.S. Dist. LEXIS 167544, 2020 WL 5510690 (W.D. Pa. Sept. 14, 2020), discussed the constitutionality of COVID-19 lockdown orders.  The opinion discusses the Pennsylvania Disease Prevention and Control Law of 1955, 35 P.S. 521.2, which defined "quarantine" as "The limitation of freedom of movement of persons or animals who have been exposed to a communicable disease for a period of time equal to the longest usual incubation period of the disease in such manner as to prevent effective contact with those not so exposed. Quarantine may be complete, or, as defined below, it may be modified, or it may consist merely of surveillance or segregation."  "Modified quarantine" is defined as "a selected, partial limitation of freedom of movement, determined on the basis of differences in susceptibility or danger of disease transmission, which is designed to meet particular situations,"

such as "the exclusion of children from school and the prohibition or the restriction of those exposed to a communicable disease from engaging in particular occupations."  "Surveillance is the close supervision of persons and animals exposed to a communicable disease without restricting their movement."  "Segregation is the separation for special control or observation of one or more persons or animals from other persons or animals to facilitate the control of a communicable disease."  The court concluded that the Pennsylvania lockdown orders were not "quarantines" as defined in the statute.  (2020 U.S. Dist. LEXIS 167544, *60-67) The case has little to do with the meaning of "quarantined" in an insurance policy.

       2.      N.Y. Comp. Codes R. & Regs. tit. 10, § 2.2 authorizes measures similar to  the Pennsylvania Disease Prevention and Control Law of 1955.  It does not purport to define terms for purposes of insurance policies or provide a definition of "quarantine" for use in common speech.

       3.      *Cassell v. Snyders,* 458 F. Supp. 3d 981 (N.D.Ill. 2020), construed an Illinois statute which authorized the Department of Public Health to "order a person or group of persons to be quarantined or isolated or may order a place to be closed and made off limits to the public to prevent the probable spread of a dangerously contagious or infectious disease . . . ." The plaintiff in Cassell was the pastor of a church who complained that the Governor had issued an order limiting the size of public gatherings. The order did not direct the closure of his church, or prevent services from being held, but only limited the number of persons that could assemble within the church building in person. Along with numerous First Amendment and other arguments, Cassell argued that the above-quoted statutory language meant that only the Department of Public Health and  not the Governor could issue an order limiting the size of public gatherings (an odd argument since the Department of Public Health is an executive agency under the control of the Governor). The court held that the statutory language at issue did not encompass an order limiting the size of

public gatherings. The case did not attempt to determine the common meaning of "quarantine," but the meaning of a statute which separately addressed, among other things, closing premises and ordering "a person or group of persons to be quarantined or isolated."

4.  *Amato v. Elicker,* 460 F. Supp. 3d 202, 220-221 (D. Conn. 2020). In sustaining emergency orders issued by the State of Connecticut in response to the COVID-19 pandemic, the court stated: "The Order limits the size of social and recreational gatherings but does not altogether prohibit Plaintiffs from assembling with other people, nor does it limit with whom Plaintiffs may assemble. Courts have upheld more extreme measures taken in response to public health needs, including quarantines, which limit a person's right to assemble with any other person."

5.  *Murphy v. Lamont*, 3:20cv0694, 2020 U.S. Dist. LEXIS 136961, *30-31, 2020 WL 4435167 (D. Conn. Aug. 3, 2020) similarly held that nothing in the Connecticut COVID orders "subjects any person to quarantine or isolation as set forth in sections 19a-131(6) and (9) of the Connecticut General Statutes." Those sections do not purport to provide a definition for insurance policies.

6.  *Antietam Battlefield KOA v. Hogan,* 461 F. Supp. 3d 214, 229 n.17 (D. Md. 2020). This was an action brought by various persons to challenge "stay at home" orders issued by the Governor of Maryland. One argument thrown in by plaintiffs was that "the Governor violated Title 14 of the Maryland public safety article when he declared a catastrophic health emergency, because none exists, and because the Governor is quarantining individuals in violation of the statute by not providing due process." In a footnote, the court "notes that it does not appear that requiring individuals to stay at home except for essential activities, which includes engaging in outdoor exercise, constitutes a quarantine of those individuals" within the meaning of Title 14 of the Maryland public safety article.

7.  *McGhee v. City of Flagstaff*, 20cv08081, 2020 WL 2308479, at *3, 2020

-13-

U.S. Dist. LEXIS 81369 (D. Ariz. May 8, 2020). This was another challenge to COVID-19 related emergency orders. The plaintiff contended that "EO 2020-33 places him under quarantine and thus could not be issued without following the procedures set forth in Arizona's quarantine statutes, A.R.S. §§36-788, 36-789." The court held that "EO 2020-33, however, does not place Plaintiff or anyone else under 'quarantine.' Under A.R.S. §36-788, a person in quarantine is strictly prohibited from leaving the quarantine premises and, except for very narrow exceptions, cannot receive visitors. A.R.S. §36-788(D), (E). . . . Because EO 2020-33 does not impose a quarantine as defined under the applicable statutes, the statutes do not apply."

Not only are the cases inapposite to determining what the common meaning of "quarantined" is to a layperson, but the issue is not whether **Defendant's** proposed construction is based on a common meaning of "quarantined."  It is whether **Plaintiff's** proposed meaning is.  If the restriction placed upon Plaintiff's son falls within one common meaning of "quarantine" but not another, the policy is ambiguous and the ambiguity must be resolved in favor of coverage.

The amended complaint makes clear that (1) New York's COVID-19 orders prohibited Plaintiff's son from traveling to camp in Massachusetts by charter bus as contracted, and (2) Massachusetts' COVID-19 orders prohibited the persons conducting the camp from going there and conducting the camp event.

A restriction on the movement of Plaintiff's son into Massachusetts, as well as a restriction on his participating in a camp in Massachusetts, is a "quarantining" of Plaintiff's son, just like preventing one's cattle from being moved across a specified line because they may have ticks or diseases is "quarantining" of one's cattle, even though the cattle are not confined to a small area.

U.S. Fire insists that because the Policy lists "quarantined" along with being "hijacked," "required to serve on a jury," and being "served with a court order to appear as a witness in a legal

-14-

action," only "enforced isolation" is relevant.  But neither jury service nor being required to appear as a witness normally results in "enforced isolation."  Furthermore covered losses include strikes, inclement weather and mechanical breakdown that causes cessation of common carrier services, terrorist incidents, "Bankruptcy or Default of an airline, cruise line, tour operator or Program Supplier (other than the tour operator or travel agency from whom You purchased Your Program Arrangements)," and hurricane warnings.  (Policy, p. 5)  All of these are events which would interfere with a trip, but are not narrowly directed to a specific individual.  There is no reason for a consumer to assume that the policy is so limited.

Defendant insists that the policy must be considered as a whole and in light of its purpose, but fails to explain how coverage for a restriction on travel intended to limit the spread of COVID-19 is inconsistent with the overall purpose of the policy.  Plaintiff is not arguing that a recycling bin with wheels is a "vehicle," as in *1070 Park Ave. Corp. v. Fireman's Fund Ins. Co.,* 313 F. Supp. 3d 528, 540 (S.D.N.Y. 2018), aff'd, 777 F. App'x 561 (2d Cir. 2019), or that a policy covering "death by accidental injury" but excluding "loss from sickness" provides coverage for death from streptococcus bacteria on the theory that inhalation of the bacteria was an "accidental injury," as in *Svensson v. Securian Life Ins. Co.,* 706 F. Supp. 2d 521, 523 (S.D.N.Y. 2010).  Rather, Plaintiff contends that it makes perfect sense to construe "quarantined" in a policy of trip and event insurance to cover both the forced isolation of the insured and an order prohibiting the insured from participating in the trip or event as planned.  In both cases, the person cannot participate in the trip or event because of official restrictions imposed to prevent the spread of disease.

## VII.   THE FACT THAT COVID ORDERS PROHIBITED THE OPERATION OF CAMP LENOX AS WELL AS PROHIBITED A BUSLOAD OF CAMPERS FROM ASSEMBLING AND TRAVELING THERE IS NOT A DEFENSE

It is obvious that a communicable disease that results in public authorities imposing restrictions on the movement or activities of people is likely to result in restrictions on the

-15-

movement or activities of other persons besides the insured.  U.S. Fire insists that if, as a result, the event or trip cannot be held, its insurance does not apply.  Specifically, it asserts that Plaintiff "cannot plausibly show compliance with the contractual requirement that her son was prevented from taking [the] Trip due to being … quarantined" because government orders issued in response to the COVID-19 pandemic both (a) prevented the management and staff of Camp Lenox from assembling and operating the facility,  and (b) prevented campers from assembling and being taken there.  (Def.Mem., pp. 3-4) U.S. Fire's theory is that Massachusetts orders preventing the operation of Camp Lenox prevent any orders prohibiting campers from going there from being the cause of any loss.

U.S. Fire's theory would render the "quarantine" coverage inapplicable under circumstances where "the insured at the time of obtaining the insurance could reasonably expect that damage such as occurred here would be covered by the policy as written."  *Barash v. Insurance Co. of North America, supra,* 114 Misc. 2d 325, 329, 451 N.Y.S.2d 603, 606 (Sup.Ct. Nassau Co. 1982).

For this reason, U.S. Fire's reasoning was rejected by the only appellate decision to date on COVID-19 insurance issues, that of the Supreme Court of the United Kingdom in *Financial Conduct Authority v Arch Insurance (UK) Ltd and Others* [2021] UKSC 1 (Jan. 15, 2021).[2]  The decision construed (among others) a policy that covered business losses due to the "occurrence of a Notifiable Disease [a term including COVID-19] within a radius of 25 miles of the Premises."  (¶50) Losses were suffered as a result of closure orders similar to the New York and Massachusetts orders involved in this case.  The insurers contended (¶177) that because the orders would have been

---

[2] The UK Supreme Court has been the highest UK court since 2009.  The Financial Conduct Authority regulates insurers in the UK.  The full text of the decision is at https://www.supremecourt.uk/cases/docs/uksc-2020-0177-judgment.pdf  Decisions of this court and its predecessor the Judicial Committee of the House of Lords have been cited by American courts.  *In re O.W. Bunker Holding N. Am. Inc.*, 607 B.R. 47, 63 (Bankr. D. Conn. 2019) (nature of contract for fuel supplied to ships); *First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 626 (1983) (force majeure applied to government owned entities).

issued to curb COVID-19 even if there were **_no_** cases within the 25 mile radius, the presence of

COVID-19 within that radius could not be the cause of any loss.  They argued that "it is necessary

to show, at a minimum, that the loss would not have been sustained but for the occurrence of the

insured peril" and that since the UK closure orders were triggered by a nationwide outbreak and

were national in scope, no insured could show that any loss was caused by the occurrence of

COVID-19 within 25 miles of the insured premises.

> Rejecting the argument, the court held (¶¶194-5):
>
> . . . It is obvious that an outbreak of an infectious disease may not be confined to a specific locality or to a circular area delineated by a radius of 25 miles around a policyholder's premises. Hence no reasonable person would suppose that, if an outbreak of an infectious disease occurred which included cases within such a radius and was sufficiently serious to interrupt the policyholder's business, all the cases of disease would necessarily occur within the radius. It is highly likely that such an outbreak would comprise cases both inside and outside the radius and that measures taken by a public authority which affected the business would be taken in response to the outbreak as a whole and not just to those cases of disease which happened to fall within the circumference of the circle described by the radius provision. . . .
>
> We do not consider it reasonable to attribute to the parties an intention that in such circumstances the question whether business interruption losses were caused by cases of a notifiable disease occurring within the radius is to be answered by asking whether or to what extent, but for those cases of disease, business interruption loss would have been suffered as a result of cases of disease occurring outside the radius. . . .  **_the parties could not reasonably be supposed to have intended that cases of disease outside the radius could be set up as a countervailing cause which displaces the causal impact of the disease inside the radius_**.  (Emphasis added)

Since the reasonable expectations of a New York purchaser of insurance upon reading the

policy are unlikely to differ from those of a British purchaser  –  the applicable standard in both

jurisdictions being the reasonable expectations of the purchaser  –  the same logic applies here.  A

disease that results in official restriction of the movement or activities of the insured is highly likely

to also restrict the movement and activities of other persons. A reasonable person purchasing trip or

event insurance would expect coverage under those facts.  Accordingly, coverage triggered by the

fact that New York's COVID-19 orders prohibited assembling and transporting a charter bus load

of campers to Massachusetts cannot be negated by the fact that Massachusetts issued COVID-19 orders that prevented other people from attending or conducting the camp, resulting in it not being held, or that the extent and severity of the disease resulting in the quarantine order was such that holding the event was unsafe.[3]  If *that* defeats causation, U.S. Fire's quarantine coverage is worthless.  As in the UK case, other consequences of the same disease that resulted in the quarantine order cannot be set up as a countervailing cause.

## VIII.  U.S. FIRE MISSTATES RELEVANT COVID ORDERS PROHIBITING THE OPERATION  OF CAMP LENOX

U.S. Fire is wrong when it claims that "On May 28, 2020, there was no order that required Camp Lenox to cancel its program or that prevented Plaintiff's son from traveling to camp." Moreover, even it is right, that just means that U.S. Fire was obligated to provide coverage under a different policy provision.

On March 23, 2020,  Massachusetts COVID-19 Order No. 13, which closed all businesses other than those providing essential services, prohibited indoor gatherings of more than 10 people, and prohibited all recreational and athletic activities, regardless of size, that brought persons into close physical contact.  (AC, ¶32) A summer camp is not "essential," and  Camp Lenox' program involved indoor gatherings of more than 10 people and recreational and athletic activities that brought persons into close physical contact.  (AC, ¶33-34)   Subsequent orders extended the prohibition until May 4, 2020 (AC, ¶35), and May 18, 2020   (AC, ¶36) On May 8, 2020 and June 6, 2020, Massachusetts issued orders providing for the phased reopening of certain businesses, but not permitting a summer camp starting June 27, 2020.  (AC, ¶37)

Furthermore, some lead time is needed to operate a camp.  Lifting restrictions on June 26,

---

[3]  The one case U.S. Fire cites, *Albert J. Schiff Associates, Inc. v. Flack,* 51 N.Y.2d 692, 417 N.E.2d 84, 435 N.Y.S.2d 972 (1980), addresses what constitutes professional activities within an error and omissions policy, and is irrelevant.

2020 would not permit a summer camp to open the next day.

New York had prohibited "all non-essential gatherings of more than ten individuals," with provision for gradual reopening by business and region.  (AC, ¶48) Plaintiff had contracted via the Camp Lenox website for travel to the camp by a charter bus that would pick up campers on Long Island and take them there.

U.S. Fire claims that New York Executive Order 202.42, issued June 15, 2020, permitted "non-essential gatherings" of as many as 25 individuals in Nassau County, provided that social distancing protocols are complied with.  However, the bus ride would not have been limited to Nassau County  – it necessarily goes through several New York counties, Connecticut and Massachusetts, and seating passengers 6' apart drastically limits bus capacity.

While U.S. Fire contends that there was no absolute prohibition on Plaintiff's son going to Massachusetts, the policy was issued with reference to a specific program conducted in a specific manner.  Group travel by campers to the camp by charter bus was part of the contracted for program.  Camp Lenox provided the transportation, not Plaintiff.

Finally, U.S. Fire's argument amounts to a contention that Camp Lenox voluntarily decided not to hold a camp session and therefore defaulted on its contractual obligation to do so.  U.S. Fire's policy also covers "Bankruptcy or Default of an airline, cruise line, tour operator or Program Supplier (other than the tour operator or travel agency from whom You purchased Your Program Arrangements)." (Policy, p. 5)   On U.S. Fire's theory, Camp Lenox defaulted by cancelling its session.  Since it is not a tour operator or travel agency, U.S. Fire is liable under the "Bankruptcy or Default" provision.

U.S. Fire cannot prevail on a motion to dismiss by arguing that a different policy provision than the one invoked by Plaintiff applies; it has to show that no coverage applies.  A legal theory is not an element of a claim.  *Johnson v. City of Shelby, Mississippi*, 574 U.S. 10, 11 (2014);  *Townsend v.*

*Benjamin Enterprises, Inc.*, 679 F.3d 41, 57 (2d Cir. 2012).

## IX.     CONCLUSION

For the reasons stated, Defendant's motion to dismiss should be denied.

Respectfully submitted,

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

Adam J. Fishbein
735 Central Avenue
Woodmere, NY 11598
(516) 668-6945
fishbeinadamj@gmail.com

T:\37178\Pleading\Plaintiff's Response to motion to dismiss_Pleading.WPD

## CERTIFICATE OF SERVICE

I, Daniel A. Edelman, hereby certify that on **March 5, 2021,** a copy of **Plaintiff's Response to Motion to Dismiss Amended Complaint** was served via ECF on all counsel of record.


Respectfully,


/s/Daniel A. Edelman
Daniel A. Edelman




Daniel A. Edelman
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

Adam J. Fishbein
735 Central Avenue
Woodmere, NY 11598
(516) 668-6945
fishbeinadamj@gmail.com